262 P.3d 100 (2011)
STATE of Washington, Respondent,
v.
Anatoliy P. STRIZHEUS, Appellant.
No. 64077-1-I.
Court of Appeals of Washington, Division 1.
September 19, 2011.
*101 Washington Appellate Project, Sea., WA, for Appellant.
Brian McDonald, King County Prosecuting Attorney, King Co. Pros/App. Unit Supervisor, Sea., WA, for Respondents.
SCHINDLER, J.
¶ 1 A jury convicted Anatoliy Strizheus of attempting to murder his spouse Valentina. Strizheus contends the trial court violated his constitutional right to present a defense by excluding evidence that his son Vladimir committed the crime. Because Strizheus did not meet his burden of showing facts or circumstances clearly pointing to Vladimir as the person who committed the crime, we affirm.

FACTS
¶ 2 Anatoliy Strizheus and Valentina are from the Ukraine.[1] The couple married in 1979 and had three children. Approximately eight years later, they divorced. In 1997, Strizheus and Valentina remarried and came to the United States with their three adult sons. Valentina and Strizheus moved to Sioux Falls, South Dakota but lived in separate apartments. Several years later, Valentina and her youngest son Vladimir moved to Nebraska.
¶ 3 Valentina moved to the Seattle area in 2005 to be near her sons Vladimir and Slavic. In February 2007, Strizheus moved to Seattle. He lived with Valentina and Vladimir and slept on the couch. At this time, Valentina was in a relationship with another man. According to Slavic, Strizheus came to Washington to improve and rekindle his relationship with Valentina.
¶ 4 On February 22, 2007, Valentina called 911 to report that Vladimir was cutting himself. When the police arrived, Valentina told the officers that Vladimir was upset because Strizheus had sex with Vladimir's girlfriend. Vladimir had punched a hole in the wall in the kitchen and broken a number of items. *102 Vladimir was convicted of misdemeanor malicious mischief and the court issued a protective order prohibiting him from having contact with Valentina.
¶ 5 On the evening of March 10, Valentina spent the night with the man she was seeing. Valentina came home at approximately 10:00 a.m. the next day. Valentina told Strizheus that she had spent the night with relatives. Valentina took a nap. Valentina said that when she woke up, Strizheus and Vladimir were home. Valentina left and went to a shopping mall at 3:00 p.m. When Valentina returned home at about 6:00 p.m., Vladimir was not there.
¶ 6 Shortly after 6:00 p.m., Valentina ran out of her residence. A neighbor, Corey Stalock, said that Valentina was "covered in blood" and frantically yelling "911." Stalock immediately called 911. Valentina had sustained multiple stab wounds to her abdomen and upper body, and defensive wounds to her arms and hands. The neighbor's girlfriend Wendy Beres applied pressure to Valentina's wounds and asked about her injuries. Valentina told Beres her "husband had stabbed her with a knife." Valentina had a cell phone in her hand. Valentina told Beres that she was "trying to get a hold of" her son Vladimir.
¶ 7 When police officer Jeffery Doll arrived, Strizheus appeared in the doorway of Valentina's residence with blood on both hands and on his clothes. As Officer Doll approached, Strizheus sat down on the stairs of the front porch. Strizheus had a laceration on his wrist and several puncture wounds on his forearm and hand. Strizheus said that Valentina was responsible for his injuries.
¶ 8 Shortly thereafter, several other officers arrived. Officer Charlene Hoch asked Valentina who hurt her. In response, Valentina said, "`Husband.'" When Officer Hoch asked whether anyone else had hurt her, Valentina again replied, "`Husband.'" Valentina told Officer Hoch that her husband was "`Anatoliy.'" Valentina also told an emergency medical technician (EMT) that her "`husband'" hurt her.
¶ 9 Medical personnel assessed Valentina's injuries as serious and transported her to Harborview Medical Center. When the emergency room doctor questioned Valentina about what happened, she confirmed that her husband had stabbed her. Valentina underwent surgery for a stab wound that had penetrated her stomach. The stab wounds in her face that were deep and affected critical facial areas also required surgery. The police placed Strizheus under arrest and took him to a nearby hospital for treatment for his mostly superficial injuries.
¶ 10 During the search of the Strizheus residence, the police found a ten-inch knife a few feet inside the front doorway. The police also found a broken glass vase, a broken bowl, and blood on the couch, on the floor, on a sliding glass door and vertical blinds, and on the wall near the sliding door. Vladimir returned home from church at approximately 8:30 p.m. When the police told Vladimir what happened, he appeared to be shocked and distraught. Vladimir told the police that he spoke to Strizheus earlier in the day and thought he may have been drinking alcohol. Vladimir called his brother Slavic and left to go to Harborview.
¶ 11 With the assistance of a Russian interpreter, the police interviewed Valentina at the hospital the night of the stabbing and again several weeks later. Both interviews were tape recorded. Valentina told the police that her 30-year relationship with Strizheus was plagued by his use of alcohol and domestic violence. Valentina told the police that after she returned from the shopping mall at about 6:00 p.m., she and Strizheus started arguing. Valentina said she tried to leave but Strizheus blocked the door. Strizheus then grabbed a knife from under a cushion where he had been sleeping and came after her. Valentina said Strizheus grabbed her as she tried to escape through the sliding glass door leading to the balcony and began stabbing her. Valentina begged Strizheus, "Please do not, don't kill me." Valentina was concerned that if she fell, "for sure, he [is] going to kill me." Valentina managed to grab the knife, push Strizheus back a little, and squeeze through the sliding glass door and escape.
*103 ¶ 12 The State charged Strizheus with attempted murder in the second degree with a deadly weapon enhancement.
¶ 13 Seven months later, in October 2007, Vladimir called 911 and told the operator that he had done "something that he felt bad about." When they arrived, the officers noted that Vladimir was intoxicated and said that he alternated between aggressive paranoia, and episodes of crying and rambling. Vladimir told the police "`[i]t's my fault, arrest me. I should be in jail.'" Valentina was also present. Valentina said Vladimir was very drunk and felt bad about what happened to her. When the police attempted to arrest Vladimir on an outstanding warrant, he tried to push one of the officers down the stairs, and was later charged with assaulting a police officer.
¶ 14 Approximately one year later, in November 2008, police officers responded to the report of a collision on Interstate-5. According to witnesses, Valentina had run into traffic in an attempt to flag down a car, causing a car to collide with a light pole. Valentina had a bump on her cheek and a swollen upper lip. In her statement to the police, Valentina said that Vladimir had been drinking and punched her in the face. The State charged Vladimir with assault in the fourth degree.
¶ 15 In January 2009, the police interviewed Vladimir about the 911 call he made in October 2007. Thereafter, the prosecutor and defense counsel also interviewed Vladimir. Vladimir was still in custody on the pending 2008 assault charge. In each of these interviews, Vladimir said that he remembered making the 911 call but that he was drunk. Vladimir denied attacking his mother with a knife on March 11, 2007.
¶ 16 In an interview before trial, Valentina refused to discuss the stabbing. In a defense interview a week before trial, Valentina said she did not remember the attack.
¶ 17 At the beginning of the trial in June 2009, the court granted the State's motion to amend the charge to attempted murder in the first degree and to add a second count of assault in the first degree. The State also moved to exclude other suspect evidence. Specifically, the State argued that there was "no evidence clearly pointing to Vladimir" as the perpetrator or establishing a connection between Vladimir and the commission of the crime. The State argued the court should exclude Vladimir's "rambling drunk 'confession'" that he later recanted, Vladimir's criminal history, and contacts with the police because there was no admissible evidence to support a defense theory that Vladimir committed the crime. The State also argued that if Vladimir was called as a witness, neither his criminal history, including the 2007 malicious mischief conviction, nor his current pending assault charge was admissible under ER 609.
¶ 18 In his trial brief, Strizheus claimed Valentina blamed Strizheus for committing the crime because she was more afraid of Vladimir than she was of Strizheus. Strizheus asserted that Vladimir "is a suspect in this case" and there was evidence that established Vladimir committed the charged crime. Strizheus argued that the evidence of Vladimir's October 2007 statements to the police, the February 2007 malicious mischief conviction, the 2008 incident resulting in the assault charge, and evidence that police had been called to the residence on several occasions in the months before the stabbing, met the requirements to admit evidence that Vladimir committed the crime. The defense further sought to introduce evidence that Vladimir was angry at Strizheus because Strizheus allegedly had sex with Vladimir's girlfriend, and evidence that Valentina broke up a physical fight between Strizheus and Vladimir a couple of days before the stabbing.
¶ 19 The trial court addressed the admissibility of the proffered other suspect evidence several times during the trial. Most of the discussion focused on the admissibility of the statements Vladimir made in October 2007 as recounted in the police reports. The State and the defense disputed whether these statements amounted to a confession to the crime. Relying on the report of one officer, the defense argued that Vladimir said that he "`stabbed his mother and father.'" The State countered that the statements the defense relied on were not actually Vladimir's words *104 but only the officer's interpretation of what Vladimir said to the other officer. According to the State, the police officer whose report Vladimir cited would testify that Vladimir's actual statements were "`[i]t's my fault, arrest me. I should be in jail.'"
¶ 20 The trial court ruled that the "other suspect evidence simply does not tend to clearly point to someone else as the guilty person. And therefore, I will deny the defense motion, grant the State's motion with respect to the presentation of other suspect information."[2]
¶ 21 Strizheus also argued that Vladimir's prior statements were potentially admissible as statements against penal interest. But the prosecutor and the defense later informed the court that Vladimir's counsel had confirmed that Vladimir did not intend to invoke his rights under the Fifth Amendment and, if called, he would testify about the prior statements to the police and deny that he attacked and stabbed Valentina on March 11.[3] Even if Vladimir's prior statements were inadmissible as substantive evidence, Strizheus argued that he should be able to call Vladimir to impeach him.
¶ 22 In response, the court made it clear that Strizheus could not call Vladimir for the sole purpose of impeachment, and that its ruling on the admissibility of Vladimir's statements under the statements against penal interest exception was based on the parties' representation that Vladimir was available to testify. If that circumstance changed, the court explained that it would revisit the issue.
If he doesn't testify, then there should be a hearsay exception that allows it in if there is enough evidence of, for others arguing other suspect. And I haven't determined if there's enough evidence, because I'm assuming he's going to testify to something with what he said. If he doesn't, we'll have to deal with it.
¶ 23 During the seven-day trial, a number of witnesses testified, including Valentina, the neighbors Stalock and Beres, police officers, EMTs, and hospital health care providers. Several of these witnesses, including a police officer, firefighter, EMT, and an emergency room doctor, testified that Valentina identified her husband as the attacker. The tape-recorded interview with Valentina that took place in the hospital on the night of the stabbing, and her interview several weeks later, were admitted into evidence and played to the jury.
¶ 24 At trial, Valentina admitted that the night before the stabbing, she had spent the night with the other man she was seeing. She also admitted that in an earlier interview, Valentina told a detective she lied to Strizheus about where she had been. Valentina testified that Strizheus was there when she came home from the mall, but said she had no memory of the attack.[4]
¶ 25 Slavic and his wife Anna also testified. Slavic said that when he saw Valentina in the hospital following the attack she did not identity her attacker. Anna likewise said Valentina did not specifically say who attacked her. Anna also said that during the month-long period when Valentina recuperated at her house, they had no discussion about the attack.
¶ 26 A forensic scientist testified about DNA (deoxyribonucleic acid) testing performed on blood found on the knife and in various locations in the residence. Tests revealed that the blood on the edge of the knife matched the DNA profile for Strizheus. The probability of a random male with a matching profile was 1 in 170 trillion. Blood on the side of the knife matched the DNA profile for Valentina.
*105 ¶ 27 Strizheus did not testify and the defense did not call Vladimir as a witness. The jury found Strizheus guilty of attempted murder in the first degree and assault in the first degree. By special verdict, the jury also found that Strizheus was armed with a deadly weapon. At sentencing, the trial court dismissed the assault conviction and imposed a standard range sentence of 234 months on the attempted murder conviction.

ANALYSIS
¶ 28 Strizheus contends the trial court violated his constitutional right to present a defense by excluding the statement Vladimir allegedly made that he stabbed his mother and father. As the State points out, in addition to Vladimir's statement, below Strizheus identified other evidence to support his argument that Vladimir committed the crime, including the malicious mischief conviction and the later charge against Vladimir for assaulting Valentina. But on appeal, Strizheus challenges only the trial court's exclusion of the statement Vladimir allegedly made to police in October 2007. Strizheus argues that the prior statement is direct evidence that Vladimir committed the crime. Strizheus claims a statement that Vladimir stabbed his mother and father, standing alone, satisfies the nexus required to admit evidence showing that Vladimir committed the crime.
¶ 29 A trial court's decision to admit or to exclude evidence is reviewed for abuse of discretion. State v. Darden, 145 Wash.2d 612, 619, 41 P.3d 1189 (2002). However, a court "`necessarily abuses its discretion by denying a criminal defendant's constitutional rights.'" State v. Iniguez, 167 Wash.2d 273, 280, 217 P.3d 768 (2009) (quoting State v. Perez, 137 Wash.App. 97, 105, 151 P.3d 249 (2007)). We review de novo an alleged denial of a defendant's right under the Sixth Amendment to present a defense. State v. Jones, 168 Wash.2d 713, 719, 230 P.3d 576 (2010).
¶ 30 A criminal defendant has a right under the Sixth Amendment of the United States Constitution and article I, section 22 (amendment 10) of the Washington Constitution to present a defense.[5]State v. Maupin, 128 Wash.2d 918, 924, 913 P.2d 808 (1996). The right to present a defense includes the right to offer the testimony of witnesses and to compel their attendance, if necessary. Maupin, 128 Wash.2d at 924, 913 P.2d 808 (citing Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). It is well settled, however, that the right to present a defense is not absolute. Montana v. Egelhoff, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996); Maupin, 128 Wash.2d at 924, 913 P.2d 808. The right to present a defense does not extend to irrelevant or inadmissible evidence. Jones, 168 Wash.2d at 720, 230 P.3d 576.
¶ 31 Washington courts have long held that to admit evidence suggesting another person committed the charged offense, the defendant must lay a foundation; that is, he must establish a train of facts or circumstances as tend clearly to point out someone besides the defendant as the guilty party. State v. Downs, 168 Wash. 664, 667, 13 P.2d 1 (1932). That foundation requires a clear nexus between the person and the crime. State v. Condon, 72 Wash.App. 638, 647, 865 P.2d 521 (1993). Mere motive, ability, and opportunity to commit a crime alone are not sufficient. Maupin, 128 Wash.2d at 927, 913 P.2d 808. The offered evidence must demonstrate a "step taken by the third party that indicates an intention to act" on the motive or opportunity. State v. Rehak, 67 Wash. App. 157, 163, 834 P.2d 651 (1992). The defendant has the burden of showing that the other suspect evidence is admissible. State v. Pacheco, 107 Wash.2d 59, 67, 726 P.2d 981 (1986).
¶ 32 In Downs, the defendants sought to introduce evidence that a known burglar, "Madison Jimmy," was in the area on the day that the charged crime occurred. The supreme court held that the trial court properly *106 excluded this evidence because "[i]n the absence of other circumstances tending in some manner to connect him with the commission of the crime," the evidence was not relevant. Downs, 168 Wash. at 667-68, 13 P.2d 1.
¶ 33 Similarly, in Rehak, the defense sought to introduce evidence that the victim's son could have murdered his father. In support of this theory, defense counsel wanted to present evidence of disagreements between the father and son, and of how the son stood to benefit financially if his stepmother were convicted. Defense counsel also sought to establish that the son had the opportunity to commit the murder. He knew where the murder weapon was kept and, without explanation, was not at work on the morning of the murder. Rehak, 67 Wash.App. at 160-61, 834 P.2d 651. We held that absent evidence indicating that the son actually committed the murder, the other suspect evidence was properly excluded. Rehak, 67 Wash.App. at 163, 834 P.2d 651; see also State v. Drummer, 54 Wash.App. 751, 755, 775 P.2d 981 (1989) (where defendant attempted to introduce evidence that several other persons had a motive to kill the victim but failed to present any evidence directly linking the other persons to the crime, the court excluded the evidence because it would only "encourage jury to speculate as to possible other assailants").
¶ 34 A prior exculpatory statement standing alone does not establish the foundation necessary to admit other suspect evidence. For example, in State v. Howard, 127 Wash.App. 862, 113 P.3d 511 (2005), the defendant sought to admit a prior statement that was exculpatory but later recanted by an alleged other suspect. A participant in the crime testified at a pretrial hearing that a person known as "Smoke Lock," not Howard, was involved in the robbery. But the participant refused to provide further information about "Smoke Lock's" identity and indicated that if called to testify, his trial testimony would materially differ from his pretrial testimony. Howard, 127 Wash.App. at 867, 113 P.3d 511. Despite the fact that the prior statement exculpated the defendant, this court upheld the trial court's ruling that the testimony was not admissible other suspects evidence because there was an insufficient nexus between "Smoke Lock" and the charged crime. Howard, 127 Wash.App. at 868-69, 113 P.3d 511.
¶ 35 Here, there was no evidence establishing a nexus between Vladimir and the crime. There was no physical evidence connecting Vladimir to the crime. No eyewitness placed Vladimir at the scene of the crime. Despite many opportunities to do so, Valentina never identified Vladimir as her attacker. No witness presented direct evidence substantially contravening the State's version of events. There was no evidence of any step taken by Vladimir that indicated an "intention to act" on his alleged motive. See Rehak, 67 Wash. App. at 163, 834 P.2d 651.[6]
¶ 36 Nonetheless, Strizheus argues that as in Maupin, Vladimir's prior statement to police is admissible other suspect evidence. In Maupin, the defendant sought to introduce eyewitness testimony showing that someone else committed the crime. The eyewitness said that he saw the victim being carried by the other suspect the day after the victim was allegedly kidnapped. Maupin, 128 Wash.2d at 928, 913 P.2d 808. The court held that the trial court erred by excluding the testimony of the eyewitness because it called into question the State's version of how the kidnapping occurred and pointed directly to someone other than the defendant as the guilty party. The court concluded that the evidence established a sufficient nexus linking someone other than the defendant to the crime for which the defendant was charged. Maupin, 128 *107 Wash.2d at 930, 913 P.2d 808. Here, unlike in Maupin, the only evidence Strizheus relies on is a statement made by Vladimir when he was admittedly intoxicated, and that he later repeatedly recanted. We conclude the trial court did not err in excluding this evidence.
¶ 37 If Vladimir's prior statement is not admissible, Strizheus asserts that the other suspect evidence rule in Washington is unconstitutional and violates his right to present a defense under the Sixth Amendment and the Fourteenth Amendment of the United States Constitution. Strizheus relies on several decisions holding that evidentiary or procedural rules that infringed upon a "`weighty interest of the accused'" to present evidence in his defense were "`arbitrary or disproportionate'" to the purposes they were designed to serve. Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (citation omitted) (internal quotation marks omitted) (quoting United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)); see Washington, 388 U.S. at 14, 87 S.Ct. 1920 (invalidating a statute that barred testimony by a co-participant in a crime unless that person had been acquitted); Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (finding unconstitutional Mississippi's evidentiary rules which denied the defendant the right to impeach his own witnesses and admit statements against penal interest); Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (overturning a decision that prevented the defendant from attempting to show at trial that his confession was unreliable); Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (holding unconstitutional a rule prohibiting hypnotically refreshed testimony).
¶ 38 But these cases do not stand for the proposition that the constitutional right to present a defense is violated whenever a state or federal rule operates to exclude favorable evidence. See Scheffer, 523 U.S. at 316-17, 118 S.Ct. 1261. And here, the constitutional challenge to Washington's rule governing admission of other suspect evidence is specifically foreclosed by the Supreme Court's decision in Holmes.
¶ 39 In Holmes, the defendant was charged and convicted of several crimes, including murder, and was sentenced to death. While the State had substantial evidence connecting the defendant to the offense, the defendant "attempted to undermine the State's forensic evidence by suggesting that it had been contaminated and that certain law enforcement officers had engaged in a plot to frame him." Holmes, 547 U.S. at 322, 126 S.Ct. 1727. He also sought to introduce evidence that a third party was actually responsible for the murder, including the testimony of several witnesses who provided an alibi and even one who admitted to committing the offense. Holmes, 547 U.S. at 323, 126 S.Ct. 1727. The South Carolina Supreme Court affirmed the trial court's decision to exclude the exculpatory other suspect evidence because there was "`strong evidence'" of guilt and especially "`strong forensic evidence'" against the accused. Holmes, 547 U.S. at 323, 126 S.Ct. 1727 (quoting State v. Holmes, 361 S.C. 333, 342, 605 S.E.2d 19 (2004)).
¶ 40 In reversing, the Supreme Court reaffirmed at the outset that it is entirely appropriate for states to place limitations on the admission of other suspect evidence.
While the Constitution thus prohibits the exclusion of defense evidence under rules that service no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.
Holmes, 547 U.S. at 326-27, 126 S.Ct. 1727. The Supreme Court further noted that South Carolina had previously followed the "widely accepted" rule that "`before [other suspect] testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances, as tends clearly to point out such other person as the guilty party.'" Holmes, 547 U.S. at 327-28, 126 S.Ct. 1727 (quoting State v. Gregory, 198 S.C. 98, 104-05, 16 S.E.2d 532 (1941) (citations omitted) (internal quotation marks omitted)). However, the Court concluded that reversal *108 was required because the South Carolina courts had "radically changed and extended" the rule adopted in Gregory by holding that "`where there is strong evidence of [a defendant's] guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt' may (or perhaps must) be excluded." Holmes, 547 U.S. at 328-29, 126 S.Ct. 1727 (quoting Holmes, 361 S.C. at 342, 605 S.E.2d 19 (alteration in original)). The standard governing admission of other suspect evidence as set forth in our case law, including Downs and Maupin, mirrors the rule as articulated in Gregory and the other cases cited with approval by the Supreme Court in Holmes.
¶ 41 We affirm the conviction of attempted murder in the first degree with a deadly weapon.
WE CONCUR: SPEARMAN, J., and DWYER, C.J.
NOTES
[1] Because several individuals involved in this case share the same last name, we refer to Anatoliy Strizheus as "Strizheus" and refer to other family members by their first names.
[2] The court rejected Strizheus's alternative argument that the malicious mischief incident and 2008 assault against Valentina were admissible under ER 404(b). The court's ruling on this basis is not challenged on appeal.
[3] The parties informed the court that Vladimir did intend to invoke his Fifth Amendment rights with respect to the pending assault charge.
[4] After she testified at trial, Valentina told the victim advocate that it was a stranger and not Strizheus nor Vladimir who stabbed her. The prosecutor disclosed this information to the defense but the defense declined to call Valentina as a witness.
[5] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." Similarly, article I, section 22 (amendment 10) of the Washington Constitution guarantees that "[i]n criminal prosecutions the accused shall have the right ... to have compulsory process to compel the attendance of witnesses in his own behalf."
[6] Strizheus claims that Vladimir's prior statements may have been admissible statements against penal interest if Vladimir decided to assert his Fifth Amendment rights. He also claims that the trial court erred in preventing him from impeaching Vladimir with his prior statements. Neither of these arguments is supported by the record. Both counsel, who had consulted with Vladimir's attorney, represented that Vladimir would testify. The court stated it would reconsider its ruling if circumstances changed. And as explained, the court merely pointed out that Strizheus could not call Vladimir if the sole purpose for doing so was impeachment. The trial court expressly did not rule that Strizheus could not call Vladimir as a witness.