# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of | ) | No. 73727-9-I |
| | ) | |
| PATRICK EVERETT MCGAFFEE, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| THE STATE OF WASHINGTON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | FILED: August 14, 2017 |
| | ) | |

MANN, J. — Patrick McGaffee appeals his continued civil commitment as a sexually violent predator following a jury verdict in an unconditional discharge trial. McGaffee argues that the trial court erred (1) under Frye,[1] by admitting testimony based on the Structured Risk Assessment-Forensic Version (SRA-FV) tool, (2) by allowing testimony of McGaffee's ranking to reoffend as against other sexual offenders, (3) by limiting McGaffee's criticism of one of the risk assessment tests used by the State, and (4) by refusing to ask one of the jury's questions. McGaffee also asserts the State committed prosecutorial misconduct during closing argument.

Finding no error or misconduct, we affirm.

---

[1] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

## FACTS

As a young adult, Patrick McGaffee repeatedly offended against prepubescent boys. In 1992, McGaffee pleaded guilty to residential burglary and attempted second degree rape of a 15-year-old boy after he broke into the boy's home with the intent of raping him. At the conclusion of McGaffee's sentence, the State petitioned for continued civil commitment under the Sexually Violent Predator Act (SVPA), ch. 71.09 RCW. In 1998, McGaffee was committed and has since resided in total confinement at the Special Commitment Center (SCC).

In 2013, McGaffee petitioned for, and was granted, an unconditional release trial pursuant to RCW 71.09.090. McGaffee moved pretrial to exclude testimony from the State's expert witness regarding the use of the SRA-FV tool. The trial court conducted a multi-day Frye hearing and heard testimony from the State's expert, Amy Phenix, Ph.D, and McGaffee's experts, Howard Barbaree, Ph.D, and Brian Abbott, Ph.D. At the conclusion of the Frye hearing, the trial court denied McGaffee's motion and concluded that the testimony concerning the use of the SRA-FV as a measure for risk assessment was admissible.

Clinical psychologist, Harry Goldberg, Ph.D, testified for the State. Dr. Goldberg diagnosed McGaffee with pedophilic disorder and fetishistic disorder and concluded those disorders amounted to a mental abnormality. Dr. Goldberg opined that McGaffee's mental abnormality causes him serious difficulty controlling his sexually violent behavior.

Dr. Goldberg then assessed McGaffee's risk of reoffending using a method known as structured clinical judgment. He used a series of actuarial tools, including the

Static-99R, Static 2002R, and Violence Risk Appraised Guide-Revised (VRAG-R) tools to consider "static" (or unchanging) risk factors. He also used the SRA-FV and STABLE 2007 tools to assess "dynamic" risk factors (also knowns as psychological vulnerabilities). Dr. Goldberg also considered protective factors and case-specific factors. Dr. Goldberg concluded that McGaffee's mental abnormality makes him more likely than not to commit predatory acts of sexual violence if not confined in a secure facility.

Clinical psychologist, Brian Abbott, Ph.D., testified for McGaffee. Dr. Abbott testified that McGaffee does not have a qualifying mental disorder and that McGaffee's risk "falls below the [statutory] threshold of more likely than not." As a result, Dr. Abbott did not assess McGaffee's risk of reoffending. Dr. Abbott criticized Dr. Goldberg's methodology including his use of the VRAG-R and the SRA-FV actuarial tools.

The jury returned a verdict finding McGaffee continues to be a sexually violent predator. The trial court ordered continued commitment at the SCC. McGaffee appeals.

## ANALYSIS

Once an individual has been involuntarily committed under the SVPA, they have the right, on an annual basis, to petition for conditional release to a less restrictive alternative or for unconditional discharge. RCW 71.09.090(2). If the issue is whether the individual should be unconditionally discharged, the State bears the burden of proving, beyond a reasonable doubt, that the person continues to meet the definition of a sexually violent predator. RCW 71.09.090(3)(c); RCW 71.09.060(1); In re Det. of Post, 170 Wn.2d 302, 309, 241 P.3d 1234 (2010).

A "sexually violent predator" is defined as any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder that makes the person "likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). "Likely to engage in predatory acts of sexual violence if not confined in a secure facility" means the person "more probably than not will engage in such acts if released unconditionally from detention on the sexually violent predator petition." RCW 71.09.020(7). This is often referred to as the "more likely than not" standard. See In re Det. of Moore, 167 Wn.2d 113, 119, 216 P.3d 1015 (2009). "The fact to be determined is not whether the defendant will reoffend, but whether the probability of the defendant's reoffending exceeds 50 percent." In re Detention of Brooks, 145 Wn.2d 275, 298, 36 P.3d 1034 (2001), overruled on other grounds by In re Det. of Thorell, 149 Wn.2d 724, 753, 72 P.3d 708 (2003).

### Frye Challenge

McGaffee argues first that the trial court erred by allowing Dr. Goldberg to testify based on the SRA-FV tool, because it is a novel risk assessment tool that does not meet the test in Frye v United States, 293 F. 1013, 1014 (D.C. Cir. 1923). We disagree.

Washington courts follow the Frye test in determining the admissibility of novel scientific evidence. State v. Copeland, 130 Wn.2d 244, 255-56, 922 P.2d 1304 (1996). Testimony is admissible under Frye where "(1) the scientific theory or principle upon which the evidence is based has gained general acceptance in the relevant scientific community of which it is part; and (2) there are generally accepted methods of applying the theory or principle in a manner capable of producing reliable results." Lake Chelan

-4-

<u>Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co.</u>, 176 Wn. App. 168, 175, 313 P.3d 280 (2013).

The admissibility of evidence under <u>Frye</u> is a mixed question of law and fact that we review de novo. <u>In re Det. of Pettis</u>, 188 Wn. App. 198, 204, 352 P.3d 841 (2015). "We undertake 'a searching review which may extend beyond the record and involve consideration of scientific literature as well as secondary legal authority.'" <u>Pettis</u>, 188 Wn. App. at 204-05 (quoting <u>Copeland</u>, 130 Wn.2d at 255-56). "We may consider materials that were unavailable until after the <u>Frye</u> hearing." <u>Pettis</u>, 188 Wn. App. at 205.

Since McGaffee's trial concluded, Division Two and Division Three of this court have reviewed and found the use of the SRA-FV tool has gained general acceptance in the scientific community, and that there are generally accepted methods of applying the test in a manner capable of producing reliable results. Both courts concluded that use of the SRA-FV test is admissible under <u>Frye</u>. <u>Pettis</u>, 188 Wn. App. at 209-10, 211; <u>In re Det. of Ritter</u>, 192 Wn. App. 493, 499, 372 P.3d 122 (2016), as amended (Apr. 12, 2016), <u>review denied</u>, 185 Wn.2d 1039 (2016). While McGaffee attempts to circumvent these decisions by arguing that the SRA-FV was applied differently in this case, his argument is unavailing.

Both <u>Pettis</u> and <u>Ritter</u> involved the use of the SRA-FV tool in conjunction with the Static-99R tool, in the same way that it was used in this case. <u>Pettis</u>, 188 Wn. App. at 210; <u>Ritter</u>, 192 Wn. App. at 498. <u>Pettis</u> and <u>Ritter</u> also involved several of the same psychological experts who testified in this case—Dr. Phenix and Dr. Abbott. <u>See Ritter</u>, 192 Wn. App. at 496 (Phenix and Abbot); <u>Pettis</u>, 188 Wn. App. at 202 (Phenix). We find

no reason to diverge from these recent decisions, and concur that the SRA-FV tool is generally accepted by the scientific community, that there are generally accepted methods of applying the tool capable of producing reliable results, and that the tool is admissible under Frye.[2]

### Percentile Ranking

The State was required to prove McGaffee's mental abnormality makes him more likely than not to commit predatory acts of sexual violence if not confined in a secure facility. RCW 71.09.020(18). The SVPA does not, however, require the State to prove that any individual actuarial tool estimates the risk of reoffending exceeds 50 percent. In re Meirhofer, 182 Wn. 2d 632, 645, 343 P.3d 731 (2015). Indeed, the SVPA "does not limit experts to the results of actuarial tests." Meirhofer, 182 Wn.2d at 645. When completing a risk assessment in SVP cases, experts generally use tools that test both static and dynamic risk factors and consider their own clinical judgment. In re Det. of

---

[2] McGaffee's brief points to the lack of peer reviewed literature supporting use of the SRA-FV tool. But as the court discussed in Pettis, this has changed:

> In December 2013, after Pettis's trial, Dr. Thornton published a peer-reviewed article describing the SRA-FV. David Thornton & Raymond Knight, *Construction and Validation of SRA-FV Need Assessment*, SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT XX(X) 1-16 (2013). The SRA-FV has been described favorably in some books: "For non-disabled clients, the [SRA-FV] (Thornton, 2002) . . . enjoy[s] relative degrees of favor, depending on the jurisdiction in which each is used." Robin J. Wilson & David S. Prescott, *Understanding and* RESPONDING TO PERSONS WITH SPECIAL NEEDS WHO HAVE SEXUALLY OFFENDED, IN RESPONDING TO SEXUAL OFFENDING: PERCEPTIONS, RISK MANAGEMENT AND PUBLIC PROTECTION 128, 134 (Kieran McCartan, ed., 2014); *see also* Alix M. McLearen et al., *Perpetrators of Sexual Violence: Demographics, Assessments, Interventions, in* Violent Offenders: Understanding and Assessment 216, 231 (Christina Pietz, et al., eds., 2014) (describing the SRA-FV as a "research-guided multistep framework for assessing the risk presented by a sex offender and provides a systematic way of going beyond static risk classification").

Pettis, 188 Wn. App. at 208-09.

Sease, 190 Wn. App. 29, 44, 357 P.3d 1088 (2015) (citing Meirhofer, 182 Wn. 2d at 646).

During his testimony concerning McGaffee's risk of reoffending, Dr. Goldberg described the results he obtained using several commonly used actuarial tools. According to the Static-99R test, the most commonly used sex offender risk tool, Dr. Goldberg explained that the results showed McGaffee had a 30.7 percent chance of committing an offense over a period of 5 years and a 42.8 percent chance over a period of 10 years. Dr. Goldberg also explained, that McGaffee scored a seven which placed him in the high category for sexual reoffense. Goldberg then explained that this score placed McGaffee in the 94th percentile of other sexual offenders. Goldberg explained that McGaffee did not have a 94 percent chance of reoffending, "[i]t just means compared to other sex offenders, he's in the 94th percentile meaning that's where he falls." Dr. Goldberg again explained his testimony in response to a question from the jury. The jury asked: "Mr. McGaffee falls into the 94th percentile of sex offender, but it doesn't mean 94 percent chance of reoffending. What does it mean?" Dr. Goldberg reiterated that it meant McGaffee is "94 percent of a higher risk than other sex offenders . . . It doesn't mean he's 94 percent going to reoffend."

McGaffee argues that this testimony was irrelevant and confused the jury by conflating the 94th percentile ranking with the absolute risk of reoffense needed under the statute. McGaffee also argues that the evidence of such a high percentile ranking was prejudicial and was likely to arouse an emotional response in the jury, rather than contribute to a rational decision. We disagree.

We review the trial court's evidentiary rulings for abuse of discretion. "A court abuses its discretion when its evidentiary ruling is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State v. Williams, 137 Wn. App. 736, 743, 154 P.3d 322 (2007). Evidence is relevant and admissible if it has any tendency to make the existence of a fact more or less probable. ER 401. Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403. Evidence is unfairly prejudicial if it is more "likely to arouse an emotional response than a rational decision among the jurors." Carson v. Fine, 123 Wn.2d 206, 223, 867 P.2d 610 (1994). The burden of showing prejudice is on the party seeking to exclude the evidence. Carson, 123 Wn.2d at 225. The trial court sits in the best position to determine the prejudicial effect of evidence. State v. Powell, 166 Wn.2d 73, 81, 206 P.3d 321 (2009).

McGaffee's percentile ranking is certainly relevant. Dr. Goldberg testified that understanding McGaffee's percentile ranking against other offenders is a starting point—it informed him that McGaffee has a higher risk of reoffending than most offenders. Further, instead of just knowing McGaffee had a high risk of offending, knowing where he ranked against other offenders provided more specific information. Dr. Goldberg also explained that the percentile ranking is frequently relied upon by others in his field and that it is "a standard practice." Based on Dr. Goldberg's testimony and argument, the trial court found the evidence relevant and admissible. We agree.

While evidence that McGaffee's risk of reoffending was in the 94th percentile against other offenders might be prejudicial, it is not so highly prejudicial so as to be excluded. Evidence is not inadmissible under ER 403 just because it may be prejudicial, as nearly all evidence will prejudice one side or the other in a lawsuit. Carson, 123 Wn.2d at 224. As Dr. Goldberg was the State's main expert, most of his testimony and evidence was bound to be inherently prejudicial. Dr. Goldberg was free to provide his expert opinion on McGaffee's overall risk of offense and was not limited to discussing the actuarial instrument used to get the absolute recidivism rates. Dr. Goldberg repeatedly explained that the percentile was not the same as the absolute risk of reoffense and testified to two smaller percentages that he specified were indicative of McGaffee's risk of reoffense. Moreover, the record supports the conclusion that the jury was rationally considering this evidence for its appropriate purpose, demonstrated by the clarifying question posed in order to ensure the evidence was properly measured.

The trial court did not abuse its discretion in allowing the testimony concerning percentile rankings.

### Dr. Abbott's Opinion of the VRAG-R Instrument

The State's expert, Dr. Goldberg, used three different actuarial tools to consider McGaffee's "static" risk factors for reoffending. McGaffee's expert, Dr. Abbott, held the opinion that Dr. Goldberg's use of VRAG-R was inappropriate. McGaffee claims that the trial court limited Dr. Abbot's criticism of the VRAG-R and consequently violated McGaffee's right to present a defense. McGaffee's argument is without merit.

While a trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, a court "necessarily abuses its discretion by denying a criminal

defendant's constitutional right." State v. Strizheus, 163 Wn. App. 820, 829, 262 P.3d 100 (2011) (internal quotations omitted). A criminal defendant has a right under the Sixth Amendment of the United States Constitution and article I, section 22 (amendment 10) of the Washington Constitution to present a defense. Strizheus, 163 Wn. App. at 829-30. However, the right to present a defense is not absolute and does not turn every trial court decision excluding evidence into an error of constitutional magnitude. "The right to present a defense does not extend to irrelevant or inadmissible evidence." Strizheus, 163 Wn. App. at 830.

During his testimony, Dr. Abbott was asked whether he believed the VRAG-R instrument should be used in forensic applications. The State objected, and after argument outside the presence of the jury, the trial court ruled that Dr. Abbott could testify as to why he did not personally use the VRAG-R but could not opine whether the tool should be used.

Despite the court's ruling, Dr. Abbott testified that the VRAG-R was unreliable in part because it had not been cross-validated on other populations, and the developmental sample was not representative of the group of offenders to whom McGaffee belongs. Dr. Abbott also testified that any cross-validation of the VRAG-R would likely show reduced predictive validity. The only objection the trial court sustained during this line of questioning, was an objection to Dr. Abbott predicting how future cross-validations would turn out, stating "you can't predict the future." Dr. Abbott, however, was then able to continue discussing the possibility of "shrinkage" and diminished accuracy in cross-validation.

The trial court's statement that the objection was sustained because "you cannot predict the future," indicates it was excluded because it was speculative. "'It is well established that conclusory or speculative expert opinions lacking an adequate foundation will not be admitted.'" Miller v. Likins, 109 Wn. App. 140, 148, 34 P.3d 835 (2001) (quoting Safeco Ins. Co. v. McGrath, 63 Wn. App. 170, 177, 817, P.2d 861 (1991)). "'In addition, when ruling on somewhat speculative testimony, the court should keep in mind the danger that the jury may be overly impressed with a witness possessing the aura of an expert.'" Miller, 109 Wn. App. at 148 (quoting Davidson v. Municipality of Metro. Seattle, 43 Wn. App. 569, 571-72, 719 P.2d 569 (1986)). Dr. Abbott's claims that future cross-validations would most likely show diminished accuracy was clearly speculative, as it assumes an outcome that cannot be verified.

McGaffee was not prevented from presenting a defense and the trial court did not abuse its discretion in limiting Dr. Abbot's speculative testimony.

*Jury Question for Dr. Abbott*

Dr. Abbott testified that McGaffee did not suffer from a mental abnormality. Because Dr. Abbott did not believe McGaffee had a mental abnormality, he did not address whether McGaffee had difficulty in controlling sexually violent behavior. Dr. Abbott also did not "specifically" address whether McGaffee was more likely than not to engage in predatory acts of sexual violence; he only conducted a risk assessment to contrast Dr. Goldberg's assessment. Dr. Abbott did not testify to which instruments or methods he relied upon in reaching his criticism of Dr. Goldberg's opinion. At the conclusion of Dr. Abbott's testimony, the jury submitted the following question: "You testified you completed a risk assessment to compare with Dr. Goldberg's. What

-11-

instruments did you use and what were the scores?" On its own motion, the trial court refused to ask the question. McGaffee now argues the trial court erred. We disagree.

In civil cases, including SVP trials, jurors are permitted to submit questions for the court to ask witnesses during the witness's testimony. CR 43(k); In re Det. Of Greenwood, 130 Wn. App. 277, 286-87, 122 P.3d 747 (2005). The court may rephrase or reword the question. On its own motion, the court may also refuse to allow a particular question from a juror to a witness. CR 43(k). We review the trial court's decision for abuse of discretion. See, e.g., Jarrad v. Seifert, 22 Wn. App. 476, 478, 591 P.2d 809 (1979).[3]

Prior to deciding whether to ask the jury's question, the trial court heard argument outside of the presence of the jury. The State argued the question was outside the scope of the testimony because Dr. Abbott had not testified to conducting a risk assessment or what instruments he had used. McGaffee's counsel agreed that the question was outside the scope of direct and redirect examination but did not take a position "as to whether that's a proper reason to exclude." McGaffee did not argue that he wanted the question asked, or state that the question was necessary.

The trial court agreed that the question was outside the scope because "It appears that this question was never asked by the respondent." The trial court further opined that the question would require spending substantial time going into a topic McGaffee had chosen not to raise, which might interfere with respondent's strategic reasoning for not going into the topic. In the end the trial court ruled, "I am using my

---

[3] "The trial court has broad discretion in propounding questions to witnesses in order that it may gain all the information possible to aid in correctly determining the disputed questions presented by the respective parties." Jarrad, 22 Wn. App. at 478.

authority under CR 43(k) and I am refusing on my own motion, with not really any objections from either of you, to ask this particular question." McGaffee then objected for the record.

McGaffee argues that the trial court's decision to withhold this question barred him from being able to present a defense. We disagree. The jury submitted this question after Dr. Abbott had testified for two days. McGaffee chose not to ask Dr. Abbott about, or have Dr. Abbott discuss, the assessment he had used. Thus, the question was undoubtedly outside the scope of the testimony. McGaffee did not argue that the question was necessary to their case or even meaningfully argue that the question should be allowed. The trial court then agreed, without any argument to the contrary. The trial court did not abuse its discretion on refusing to ask the question.

*Prosecutorial Misconduct*

McGaffee next argues that the State committed prosecutorial misconduct during closing arguments. We disagree.

In determining whether prosecutorial misconduct has occurred, we first look at whether the defendant objected to the alleged misconduct. State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). "If the defendant objected, we evaluate (1) whether the prosecutor's comments were improper and (2) whether a substantial likelihood exists that the improper comments affected the jury's verdict." Magers, 164 Wn.2d at 174. The defendant bears the burden of showing both prongs of prosecutorial misconduct. Magers, 164 Wn.2d at 191 (citing State v. Hughes, 118 Wn. App. 713, 727, 77 P.3d 681 (2003)). If the appellant failed to object to the improper remark at the trial court, they waived the error "unless the remark is so flagrant and ill intentioned that it causes an

enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)).

In closing argument, a prosecutor has wide latitude to draw reasonable inferences from the evidence and to express such inferences to the jury. Magers, 164 Wn.2d at 192. A prosecutor's remarks should be viewed in "context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." Magers, 164 Wn.2d at 192 (quoting State v. Brown, 132 Wn.2d 529, 563, 940 P.2d 546 (1997)).

McGaffee assigns error to four comments made during the State's closing argument. We address each in turn.

A.    Comments without objections

Three of the four statements McGaffee complains of must be analyzed under the "enduring and resulting prejudice" standard. "Failure to request a curative instruction or move for a mistrial 'strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial.'" In re Det. of Law, 146 Wn. App. 28, 51, 204 P.3d 230 (2008) (quoting State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

First, McGaffee claims that the State committed misconduct by suggesting that the jurors could rely on their subjective beliefs, when the State said,

> 'More likely than not' is defined as 50 percent, greater than 50 percent, in your instruction. That means that based on the evidence, you believe there's at least 50 percent plus something that he will reoffend; that does not mean that the actuarial percentage has to be above 50 percent.

This statement is not error because it is a correct statement of the standard and the law. The statement clearly limited the juror's decision to being "based on the evidence," and was not arguing that the jury could use their "subjective belief" as McGaffee suggests.

Second, McGaffee argues the State misstated the burden of proof by saying,

> Actuarials cannot predict the future. We don't have a crystal ball. We don't know whether or not he will reoffend or won't reoffend. That's not what you're being asked. You're being asked to see whether or not it's likely.

This statement is also an accurate statement of the standard and the evidence. The State was simply admitting the limitations of the actuarial tools relied on by the experts. Although the statement that the jurors are "being asked to see whether or not it's likely" could have drawn an objection requiring that the State clarify that it must be "more likely than not," this error was not "enduring" as the correct legal standard was repeatedly provided.

Finally, McGaffee argues the State committed misconduct by arguing the absence of evidence of a current pedophilic disorder did not mean it was not there. Using a vacuum analogy, the State said,

> So say a vacuum . . . a vacuum is like the absence of air. It's that sucking that happens. You can't see it, you can't observe the vacuum. That doesn't mean it's not there. Right?
> How do we know that it's there? You look at the evidence around the vacuum. You look at what's going on around it, that things are being pulled into it. Right? So you can see what's happening to the feather when you hold it up next to the vacuum, and that's how you know there's a vacuum.
> Similarly, you can look at Mr. McGaffee, and in the absence of direct, Mr. McGaffee on the stand saying I continue to be a pedophile, I continue to suffer from pedophilic disorder, you can look at the evidence around it to determine whether the condition still exists.

Considering the State's analogy in the "context of the total argument," as is required, this statement was not a claim that the jury need not rely on the evidence. The statement was a description of the state of the evidence and an argument that the jury may use circumstantial evidence in the absence of direct evidence. This argument was not misconduct, and, though awkward, was not so "flagrant and ill intentioned" that it caused "an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." Russell, 125 Wn.2d at 86.

B.      Comment with objection

McGaffee did object and request a mistrial during closing argument after the State used a "soup" analogy to describe the evidence that was presented at trial. Because McGaffee did object, the first question is whether the State's comments were improper. Magers, 164 Wn.2d at 174.

During closing argument, the State offered a PowerPoint slide presentation that showed Dr. Goldberg's name, a bowl of soup, and the word "risk assessment" with arrows pointing toward it showing the different measures Dr. Goldberg used to reach his "risk assessment." The next slide showed Dr. Abbott's name, then the word "risk assessment" with no arrows demonstrating he had not provided any testimony to explain his assessment. While the slide was before the jury, the State argued,

> So if we were to go back and look at the risk assessment, if you only have the actuarial tools, you don't have a risk assessment, you don't have soup. If you don't have dynamic risk factors, or you just have case-specific factors, and protective factors, you don't have a risk assessment. The soup has to be completed, and Dr. Goldberg completed the risk assessment. Dr. Abbott, this is his risk assessment.

McGaffee objected and the trial court overruled the objection. The State continued,

Dr. Abbott took the stand and he told you that Mr. McGaffee is not likely to reoffend, not -- sorry, is not more likely than not to reoffend, but he did not support his conclusion. [Dr. Abbott] criticized the use of the VRAG, he talked a little bit about the use of the percentile rankings, but he did not support his conclusion. Dr. Goldberg is the only one that did.

McGaffee moved for a mistrial. The trial court denied the motion.

McGaffee argues first that the "soup analogy" improperly trivialized a critical legal standard to everyday decision making. Washington courts have found prosecutorial misconduct when a prosecutor "compares the reasonable doubt standard to everyday decision making" because "it improperly minimizes and trivializes the gravity of the standard and the jury's role." State v. Lindsay, 180 Wn.2d 423, 436, 326 P.3d 125 (2014). This rule does not apply here. The State was using the "soup" analogy to describe the evidence, not to explain reasonable doubt, and is thus not relevant under this line of cases.

McGaffee next argues that the argument was misconduct because it improperly transferred the burden onto McGaffee to prove that he was not likely to reoffend, instead of on the State to prove that he was likely to offend. McGaffee argues, "[t]he respondent has no burden to demonstrate that he is safe to be at large. The respondent has the right to expert assistance, but no obligation to present any evidence, and certainly no obligation to develop risk assessment testimony." McGaffee maintains that this error was "particularly egregious" because the State was arguing that "McGaffee should be faulted for not presenting evidence the prosecutor knew to have been earlier excluded by judicial order," citing to State v. Kassahun, 78 Wn. App. 938, 952, 900 P.2d 1109 (1995).

-17-

"Arguments by the prosecution that shift the burden of proof onto the defense constitute misconduct." State v. Thorgerson, 172 Wn.2d 438, 466-67, 258 P.3d 43 (2011). "A prosecutor generally cannot comment on the lack of defense evidence because the defense has no duty to present evidence." Thorgerson, 172 Wn.2d at 466-67; State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). But, in closing argument, a prosecutor has wide latitude to draw reasonable inferences from the evidence and to express such inferences to the jury. Magers, 164 Wn.2d 174 at 192. "An argument about the amount or quality of evidence presented by the defense does not necessarily suggest that the burden of proof rests with the defense.'" Thorgerson, 172 Wn.2d at 466-67 (quoting State v. Gregory, 158 Wn.2d 759, 760, 147 P.3d 1201 (2006)).

Here, the State's argument was not a comment on the amount and quality of the evidence presented by the defense, and did not improperly shift the burden of proof onto the defense. The mere mention that defense evidence is lacking does not constitute prosecutorial misconduct or shift the burden of proof to the defense. State v. Jackson, 150 Wn. App. 877, 885-86, 209 P.3d 553 (2009). The State clearly explained to the jury that the State had the burden of proof. The State also explained that the jury was the sole judge of credibility and outlined numerous reasons why it should find the State's witnesses more credible than McGaffee's witness. The prosecutor did not argue that the jury should find McGaffee guilty because he did not present a risk assessment. The State's argument was that McGaffee's witness, who attacked the risk assessments used by the State, admitted to doing one himself, then did not present such an

assessment, was less credible than the State's witnesses. See Jackson, 150 Wn. App. at 886. This was also not misconduct.

Finally, McGaffee argues that the State committed misconduct by benefitting from McGaffee's failure to present a risk assessment after they specifically objected to the trial court admitting the jury question that would have asked Dr. Abbott to discuss the risk assessments he relied on. McGaffee bases this argument on the ruling in Kassahun, in which the State kept the defendant from discovering evidence, and then used the defendant's inability to present that evidence against him in closing argument. Kassahun, 78 Wn. App. at 952.

The facts in this case are readily distinguishable from Kassahun. Here, unlike in Kassahun, the State did not prevent McGaffee from asking Dr. Abbott to list the methods he relied on in reaching his conclusion during the two days in which Dr. Abbott testified. Moreover, McGaffee did nothing to induce the court to allow the jury instruction to be presented to Dr. Abbott. While the State's actions were underhanded, given that they said the question of what instrument Dr. Abbott used was "not needed" and then argued in closing that he was less credible due to not providing such instruments,[4] the State did not keep McGaffee from presenting the evidence of Dr. Abbott's risk assessment.

The State did not commit prosecutorial misconduct.

_____

[4] "I'm sure we can do it, it will be fairly time consuming, and ultimately I don't know that it would be that illuminating to the jury given that Dr. Abbott's testimony was that Mr. McGaffee is under 50 percent in his assessment. So we're not going to get any new information out of it, other than the fact that he used an instrument, and what that instrument's score was. So the answer is not needed. The evidence that Dr. Abbott has is in."

*Cumulative Error*

The cumulative error doctrine applies only when several trial errors occurred which, standing alone, may not be sufficient to justify a reversal, but when combined together, may deny a defendant a fair trial. State v. Hodges, 118 Wn. App. 668, 673-74, 77 P.3d 375 (2003). Because McGaffee has identified no errors, the cumulative error doctrine does not apply.

We affirm.

_____ Mann, J.

WE CONCUR:

_____ Leach, J.     _____ Cox, J.

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2017 AUG 14   AM 10: 13