IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

HARUN H. SHEIKH,

Appellant.

No. 84650-7-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Sheikh appeals his convictions for three counts of rape of a child in the first degree and one count of attempted rape of a child in the first degree based on the 2014 assaults of his neighbors' then nine-year-old daughter, A.M. Sheikh contends that the trial court erred in denying his private defense counsel's motion to withdraw and substitute counsel and in admitting child hearsay statements. Sheikh also challenges the court's exclusion of text messages he argues violated his right to present a defense. He finally contends that the prosecutor committed misconduct by misstating the burden of proof and improperly shifting the burden to the defense. We affirm.

FACTS

Over Labor Day weekend in 2014, then nine-year-old A.M.'s parents attended a convention out of town and left A.M. and her younger brother in the care of a family friend who lived in their home, Lillian Makumbi. Makumbi needed to attend work outside the home on the day A.M.'s parents, C.M. and P.M., were set to return, so

Makumbi brought the children to the home of a neighbor, Harun Sheikh, and his wife. Sheikh was friends with P.M. and the two were attempting to set up a computer business.

While at Sheikh's home, A.M. was downstairs with her younger brother when Sheikh asked her to come upstairs. When A.M. got upstairs, Sheikh showed her a pornographic video online depicting a woman performing oral sex on a man. Sheikh told A.M. that she was going to do the same to him then forced her to do so after she refused.

Sheikh then attempted another sexual assault in his bedroom, after which he assaulted A.M. again in his garage and later at A.M.'s house, where he ejaculated, at which point he brought her back to his house. In between the sexual assaults Sheikh told her if she told anyone what happened "you will find yourself in a grave with somebody else."

A.M. did not tell anyone at first, but because she felt "sick in body [sic]" she thought telling someone would make her feel better. Witness testimony slightly differed as to how A.M.'s parents learned about the incidents. Makumbi testified that on September 16, A.M. told her Sheikh had made her watch pornography and asked A.M. to perform oral sex on him. Makumbi said she then told A.M.'s father, P.M. P.M. stated he relayed what Makumbi told him to his wife. A.M. testified that she believed she first told her parents in a conversation in the garage. C.M. testified that she overheard A.M. speaking to her brother and became concerned, so she asked her daughter what happened. Both parents testified that they approached A.M. together and asked her

2

about what had happened. A.M. told her parents that Sheikh forced her to perform oral sex. A.M.'s parents immediately reported the incident to police.

After police were notified, A.M. was taken to the emergency room on September 27. A.M. reported to the nurse, Rebecca Ainley, that she had gone to a neighbor's home on Labor Day weekend and the neighbor had shown her a "bad site." A.M. reported that the neighbor had pulled her pants down and touched her with his "privates."

A.M. also completed a forensic interview with child forensic interviewer, Carolyn Webster, a victim advocate, and a police officer. This interview was video recorded. In that interview, A.M. provided a detailed account of Sheikh showing her a pornographic video and each of the four instances of rape and attempted rape Sheikh committed against her.

## Procedural History

Sheikh was subsequently charged with one count of rape of a child in the first degree.[1]

Sheikh initially retained a private attorney in 2018. In November 2020, that attorney suffered a stroke and was unable to practice law. Another private attorney (counsel) took over many of the first attorney's cases, including Sheikh's, in January 2021. Due to the COVID-19 pandemic and his change in attorneys, Sheikh's trial was continued repeatedly, resulting in 30 trial settings.

---

[1] Sheikh was initially charged in 2014, but those charges were dismissed without prejudice. Following the sexual assault, A.M., her mother, and brother moved out of the country. After returning to the United States, A.M. lived with her father out of state before returning to Washington to live with her mother in 2018. The charges were refiled in 2018 and are the basis for this appeal.

In May 2022, trial was set for June 6, 2022 and the State advised Sheikh that it intended to amend the information and add two more counts of rape of a child in the first degree and a count for attempted rape of a child in the first degree. Counsel informed Sheikh of the State's intention.

At a readiness hearing before the presiding judge of King County Superior Court on June 3, the State explained that since the last court hearing, the parties have completed about 12 interviews, covering nearly every witness needed for motions as well as most of the substantial trial witnesses. The State explained that it was ready to proceed to trial on June 6, but wanted to alert the court that for a couple of weeks starting June 20, there would be only one or two days of actual testimony because of pre-planned vacations of both witnesses and himself and court holidays. The State explained those availability issues would go away on July 6, but that it nevertheless was prepared to go to trial on June 6 and was not asking for a continuance because this was an old case.

Sheikh's counsel informed the court that Sheikh had fired him earlier that week, that he consulted with a Seattle University School of Law professor who advised that counsel had a duty to immediately move to withdraw. Counsel explained that "[t]here has been a complete breakdown of the attorney-client relationship and that puts me in a position to be unable to provide an effective assistance of counsel." Thus, counsel filed a motion to withdraw and a motion to continue trial so that Sheikh could obtain new counsel. Counsel added, "if the Court wants more specific details, that we have an in camera, ex parte hearing under seal. I don't think it's appropriate that the state participate or be allowed to see the reasons. So I'm purposefully being

4

vague, Your Honor."

The court then asked Sheikh if there was something he would like to tell the court. Sheikh answered, "No," and explained that he simply did not want to work with counsel and wanted to retain a different attorney. When asked if he had someone in mind, Sheikh named two attorneys he had spoken to and that one of them said that if the case got continued the new attorney would meet with Sheikh to discuss the matter and go from there. The court expressed concerns about continuing a four-year-old case on the eve of trial, recognizing that a change of counsel would delay the case to allow for any attorney to get involved and up to speed. The court explained:

> So I guess one of the hesitations the Court has is that if the Court is to grant this request I would need to know how long the attorney would need to prepare for trial. If they're going to tell me another year the Court's not going to grant a motion to substitute. If they're going to say 6 weeks I might be more willing to do that. But if it's somewhere in between it would depend on the skill level and ability for attorney – a new attorney to come up to speed.
> The attorneys you've mentioned, Mr. Sheikh, I'm not familiar with those attorneys so I don't know their level of experience and capacity. As you've heard from [counsel], he's an experienced attorney who has been practicing for a long time and the Court is aware of his skill and ability and does understand that he is fully capable of taking on such a case and is able to competently try a case of this complexity.
> So I think the Court would be very reluctant to grant a change of counsel on the eve of trial without knowing exactly who is willing to come in and what their capability and capacity is and how long they would need to get ready for trial.

Because there were other reasons to continue the case anyway, the court was open to allowing Sheikh time to provide the information the court was seeking in order to rule on the motion to withdraw. At this point, Sheikh interjected and said the reason he wanted a new attorney is because he had hired his original attorney and that current counsel, who he did not know, had taken over the case and asked for many continuances.

Sheikh said he agreed without questioning him but that on the day of the firing, Sheikh asked counsel what he had been doing the whole month and "he told me with his own mouth that he never done nothing." The State objected to the motion to withdraw. Sheikh's counsel said he did not want the court to engage in a colloquy with his client, but noted that "certainly we have different viewpoints on what happened and what is happening."

Given the witness availability issue previously articulated by the State, the court continued the trial to July 6 and set a hearing for June 10 to address Sheikh's motion to withdraw.

At the June 10 hearing, Sheikh appeared with counsel and the new attorney he proposed to substitute for counsel. The new attorney stated he understood the current trial date is in early July, but explained that he would need "at least a three month continuance" to get his "bearings and then at that point . . . reassess." The State objected to the substitution of counsel for multiple reasons, including the fact the request was made on the verge of trial. The State explained

> this is an extraordinarily old case. It is a child hearsay case. The victim was 9 years old at the time this occurred. The victim is nearly 18 years old. The majority of her life has been waiting for the pendency of this case. I understand that that delay has not been at fault by the defendant or necessarily defense counsel by any means, but the victim has an extreme incentive to have this case resolved and simply be free of what has been done to her for the majority of her life.

Sheikh's counsel asserted that "there has been a complete breakdown of the attorney-client relationship. I'm not able to communicate or work with the client or he with me at this point. And so for that . . . reason alone I would urge the Court to grant the substitution." The court observed that counsel had been on the case since January

2021 and the court had not received any information that Sheikh was dissatisfied with counsel or that there were any communication issues. The court explained that it would be willing to grant a four- to six-week continuance if the new attorney could guarantee to the trial court that he would be prepared in that time. The new attorney could not.

The court said it would hear from counsel and Sheikh,

but based on the record before the Court, as I've articulated, the number of continuances and the way this case has proceeded and also based on [counsel's] years of experience and skill and his hard work in the last few weeks to get the case prepared for trial and that the trial is approaching quickly and that it's been pending for four years, the Court will deny the motion to substitute counsel.

Counsel confirmed that the breakdown of the attorney-client relationship did not occur until recently and that the relationship has not been repaired, and, if anything, has gotten worse. Sheikh asserted his right to hire the attorney of his choice and again stated that counsel had told Sheikh that he had done nothing in his case so far for this whole year. Sheikh said he met counsel two or three times in his office and they "were just sitting." Sheikh also complained that counsel called Sheikh on a Saturday and Sunday. Sheikh said, "I never seen any attorney that calls his clients to come on Saturday and Sunday. You know, people take their breaks on the weekend. So that was (unintelligible) the issue as well." Sheikh said he was very upset after leaving counsel's office because "communicating with your attorney he shouldn't be banging the table, you know, screaming at you so that makes me feel unsafe." Sheikh also said the new attorney is "the right . . . character and right image for me to be my attorney." The court did not change its ruling observing that nothing prevented the new attorney to be co-counsel and assist with the communication issue, but that current counsel had been on the case for 18 months, had done a lot of work, has prepared the case, conducted a

lot of interviews, is a competent attorney and ready to go forward.

On the morning of trial,[2] before being assigned out to the specific trial court, defense counsel renewed his motion to withdraw before the presiding judge and requested an ex parte hearing outside the presence of the State. The court asked if there was anything different since the last hearing the court should be aware of. Counsel said "every time I try to do my job then it just – then we have a problem again, so. So the problem has reasserted its angry head." The court stated

> I'm not hearing anything that would rise to the level of the Court to intervene into whatever difficulties you are having.
> I understand these relationships can be complicated and challenging, but as I've indicated previously, the request to substitute counsel and to change counsel here at the eve of trial would not be appropriate absent some very specific information about the breakdown in attorney-client relationship. I haven't heard any specifics. I know you've asked for an ex parte request. We've had previous hearings where we've discussed some of the communication issues that have been going on.
> So if you need to submit a declaration under seal, I'm willing to consider that, but at this time I don't have enough specific information to proceed to withdraw – to allow counsel to withdraw and so would deny the request.

The matter was assigned out to the trial court where counsel renewed the motion. Counsel explained that it would be "ineffective assistance of counsel" if he did not re-raise the motion. The trial court noted that the presiding judge had heard and denied the motion twice and if he intended to file a declaration under seal the matter should be heard by the same judge who previously heard the motion. Meanwhile, to accommodate some scheduling adjustments and allow counsel time to file his declaration under seal, the court asked for counsel's position regarding allowing a witness to testify via Zoom in the child-hearsay hearing. Counsel asked to confer with

---

[2] Trial was continued from July 6 to July 11 to accommodate the need for a new forensic report because the previous forensic detective retired.

Sheikh and, after doing so, agreed as long as it was for the hearing only and not for testifying in front of the jury.

The next day, the presiding judge confirmed he reviewed counsel's filed declaration and denied the motion. The court explained

> The information articulated here discusses some difference of opinion in strategy and choices. And of course that happens between attorneys and their clients and that's just the way of a normal relationship. And ultimately the defendant here gets to choose how he wants to proceed within legal parameters, and nothing that has been described here is beyond what would be ethical or legal patterns other than a disagreement of strategy, perhaps some misunderstanding of how the law works. But again, this is something that often happens between attorneys and their clients. And so the Court, based on this information presented, will deny the motion to withdraw.

The presiding judge further noted for the record that he has observed counsel and Sheikh in conversations in the lobby and courtroom and, though he does not know the substance of those conversations, they appear to be some level of communication observed by the court. The judge also said counsel has

> prepared the case for trial by doing detailed briefing and exhaustive interviews to prepare this case for trial. And so the Court finds that his level of expertise and work product would meet the standards of competent counsel and therefore is denying the motion to discharge and having this case proceed to trial.

The next day, the State amended the information charging Sheikh with three counts of rape of a child in the first degree and one count of attempted rape of a child in the first degree.

The court subsequently held a hearing to determine the admissibility of child hearsay statements made to A.M.'s parents and Makumbi. The State also sought to admit the child forensic interview A.M. gave to police after she reported Sheikh's abuse to her parents. After hearing testimony from multiple witnesses regarding A.M.'s

statements and the surrounding circumstances, the trial court ruled that A.M.'s statements had an indicia of reliability, including that A.M. had no apparent motive to lie and that she did not have a character for untruthfulness. The statements were admitted at trial and video of the interview played for the jury.

During trial, Sheikh sought to introduce text messages he received regarding his business transactions with P.M. and P.M.'s friend. Sheikh argued that the text messages supported his assertion that a failed business deal between Sheikh and P.M.'s friend provided a motive for A.M. to fabricate her story in retaliation against Sheikh. The trial court ruled that the messages were not relevant because they contained no information tying them to A.M. or anyone in her family, the sender was unknown, and they did not create a nexus between the proposed motive to fabricate and the allegations made by A.M. The messages were excluded. Sheikh did not testify at trial.

Sheikh was ultimately convicted on all counts by the jury. Sheikh was subsequently sentenced to an indeterminate sentence of 240 months to life on each of the three counts of rape of a child in the first degree and 180 months to life on the count of attempted rape of a child in the first degree.

Sheikh appeals.

DISCUSSION

Substitution of Counsel

Sheikh argues that the trial court violated his right to counsel under the Sixth Amendment when it denied his motion to substitute counsel. Sheikh specifically challenges the trial court's application of the balancing test and states that the court

10

failed to evaluate each of the 11 factors outlined in State v. Hampton, 184 Wn.2d 656, 669-70, 361 P.3d 734 (2015).  We disagree.

The Sixth Amendment of the United States Constitution allows defendants who retain private counsel to retain the private counsel of their choice.  Hampton, 184 Wn.2d at 662.  The right to private counsel of the defendant's choice, however, is not absolute.  Id. at 663 (citing United States v. Gonzalez-Lopez, 548 U.S. 140, 151, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006)).  The United States Supreme Court has explained that one of the basic limits on the right to counsel of defendant's choosing is the "trial court's wide latitude in balancing the right to counsel of choice . . . against the demands of its calendar."  Id. (citing Gonzalez-Lopez, 548 U.S. at 152).  The trial court applies a balancing test "weigh[ing] the defendant's right to choose his counsel against the public's interest in the prompt and efficient administration of justice."  Id. (alteration in original) (quoting State v. Aguirre, 168 Wn.2d 350, 365, 229 P.3d 669 (2010)).  "The resolution of this balancing exercise falls squarely within the discretion of the trial court."  Id. (quoting Aguirre, 168 Wn.2d at 365).

The decision whether to allow a continuance to substitute privately retained counsel is "highly fact dependent" and "there are no mechanical tests" that can be applied.  Id. at 669 (citing Ungar v. Sarafite, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964)).  Instead the trial court considers "all relevant information," including the following 11 factors:

> (1) whether the request came at a point sufficiently in advance of trial to permit the trial court to readily adjust its calendar;
> (2) the length of the continuance requested;
> (3) whether the continuance would carry the trial date beyond the period specified in the state speedy trial act;

(4) whether the court had granted previous continuances at the defendant's request;
(5) whether the continuance would seriously inconvenience the witnesses;
(6) whether the continuance request was made promptly after the defendant first became aware of the grounds advanced for discharging his or her counsel;
(7) whether the defendant's own negligence placed him or her in a situation where he or she needed a continuance to obtain new counsel;
(8) whether the defendant had some legitimate cause for dissatisfaction with counsel, even though it fell short of likely incompetent representation;
(9) whether there was a "rational basis" for believing that the defendant was seeking to change counsel "primarily for the purpose of delay";
(10) whether the current counsel was prepared to go to trial;
(11) whether denial of the motion was likely to result in identifiable prejudice to the defendant's case of a material or substantial nature.

Id. at 669-70. "Not all factors will be present in all cases, and thus a trial court need not evaluate every factor in every case, but we will not prohibit a trial court from considering relevant information." Id. at 670. A defendant may not rely on a general loss of confidence or trust alone to justify appointment of a substitute new counsel. State v. Schaller, 143 Wn. App. 258, 268, 177 P.3d 1139 (2007). "Counsel and defendant must be at such odds as to prevent presentation of an adequate defense." Id.

We review the trial court's decision whether to grant a motion to substitute counsel for abuse of discretion. Hampton, 184 Wn.2d at 670. A trial court abuses its discretion "when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). "A decision is based 'on untenable grounds' or 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." Hampton, 184 Wn.2d at 670 (quoting State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)). "A decision is 'manifestly unreasonable' if the court, despite applying the correct legal standard to the supported facts, adopts a view

12

'that no reasonable person would take,' and arrives at a 'decision outside the range of acceptable choices.'" Id. at 670-71 (quoting Rohrich, 149 Wn.2d at 654).

Unlike in the case of appointed counsel, motions to substitute private counsel "ha[ve] never been governed by the three-part extent-of-conflict analysis" outlined in In re Pers. Restraint of Stenson, 142 Wn.2d 710, 724, 16 P.3d 1 (2001). State v. Hampton, 182 Wn. App. 805, 821 n. 13, 332 P.3d 1020 (2014), rev'd on other grounds by Hampton, 184 Wn.2d 656, 361 P.3d 734 (2015). A defendant is permitted to fire his retained counsel for any reason or no reason, unless substitution would cause significant delay or inefficiency. United State v. Rivera-Corona, 618 F.3d 976, 979-80 (2010).

In the instant case, we conclude that the trial court properly applied the balancing test outlined in Hampton and did not abuse its discretion in denying Sheikh's motion for substitution of counsel. Defense counsel first took on Sheikh's case in January 2021, after Sheikh's first attorney became incapacitated and was unable to continue the representation. Defense counsel first moved to withdraw on June 3, 2022, days after Sheikh had fired him. At the time of the motion, trial was set to begin on June 6. Defense counsel indicated that Sheikh's concerns regarding his representation had been recent. At this time, Sheikh said the reason he wanted a new attorney is because counsel told Sheikh that he had done nothing on this case. This was despite the fact the State just told the court the parties had completed 12 interviews. Counsel said he and Sheikh have "different viewpoints on what happened and what is happening." Nonetheless, because witness availability issues supported continuing the trial to July 6,

the court set a hearing for June 10 to allow Sheikh to find a qualified attorney who could come up to speed on his case in six weeks.

But the new attorney who appeared at the June 10 hearing said he needed "at least a three month continuance so I can, you know, get my bearings and then at that point, you know, reassess." Counsel maintained that there was "a complete breakdown of the attorney-client relationship." Sheikh again asserted counsel had not done any work on the case until that week before trial was scheduled and said another reason he wanted a new attorney was because counsel had called him on weekends. Sheikh asserted that he left counsel's office upset and claimed counsel had been "banging on the table, you know, screaming" which made Sheikh feel unsafe.

In denying the motion, the court noted Sheikh's frustrations, but explained that the current counsel had "done a lot of work and the interviews" and that there was "no way the court can be assured that even if substitution of counsel is allowed that in three months [proposed substitute counsel] will say he's ready." The trial court stated that defense counsel had been on the case for 18 months and had done "a lot of work" and was "prepared" and "competent."

When defense counsel again moved to withdraw the morning of trial, the court was not presented with any specific information establishing a legitimate cause for dissatisfaction with counsel. Nevertheless, the court invited counsel to file a supporting declaration if that was needed.

In the declaration, counsel explained that Sheikh had not attended any appointments made for trial preparation and rebuffed counsel's attempts to discuss alternative resolutions or to educate Sheikh on potential issues and evidence at trial

14

such as the child hearsay exception. Counsel explained that Sheikh asserts that he only needs to tell the jury he is innocent and would not meaningfully discuss any possible resolution short of trial. Counsel said when he tried to relay the State's offer to plead guilty to one count of rape of a child for a recommendation of 7.75 years or face additional counts which would make the standard range 20 years to 26.5 years to life, Sheikh would become enraged. Counsel stated that Sheikh "accuses counsel of slamming doors, yelling at him and making him come to the office." Counsel explained that he has no control over his client, who refuses to listen to any legal advice and that counsel "still has no idea about certain factual matters that his client could clarify but refuses."

The court reviewed the declaration and determined that it indicated only a "difference of opinion in strategy and choices." The court noted that though those differences presented challenges in communication between counsel and Sheikh, it was apparent from the court's observations that the two continued to communicate. The trial court again considered the age of the case and the fact the parties were ready for trial:

> [T]here have been 21 omnibus hearings in this case, 30 trial sets, and so the Court determined, based on that record, the length of time that this case was getting ready for trial, and the experience and level of the attorneys to be prepared for trial, that the 4 years to get prepared, as well as the one and a half years that [defense counsel]'s been on the case, to be sufficient time to be ready for trial.

The court observed that defense counsel "prepared the case for trial by doing detailed briefing and exhaustive interviews" and that his expertise and work product "would meet the standards of competent counsel."

Sheikh had 18 months to fire his counsel, which he did not do despite claiming counsel was not doing anything in the case. Certainly, when trial was looming, counsel

was required to advise Sheikh of the State's offer in context of possibly facing more counts and a greater sentence. While attorneys may prefer to have clients accept their legal advice, clients certainly are not required to do so. Nor are they required to provide more factual explanations to their counsel related to the charges that they face.

Though counsel's declaration provides an explanation as to why counsel was frustrated with Sheikh, the record does not support a "complete" communication breakdown. Counsel and Sheikh continued to communicate during trial. Sheikh does not, otherwise, establish that his relationship with counsel prevented the presentation of an adequate defense. Schaller, 143 Wn. App. at 268. The court was not required to analyze every factor listed in Hampton. 184 Wn.2d at 669-70. While it is true that Sheikh stated he did not feel safe because counsel had allegedly banged the table and yelled, he made no mention of a concern for safety on June 3. Sheikh also claimed that when they met in counsel's office they were "just sitting" and one of Sheikh's bases for wanting a new attorney is because his counsel wanted to meet with him on the weekend. We note that trial courts should take seriously a defendant's claim that they feel "unsafe" with their attorney, appointed or retained. In this case, the trial court had observed Sheikh and counsel interact in the courtroom and elsewhere in the courthouse and was in the best position to determine the persuasiveness of Sheikh's claim of feeling unsafe. This court defers to the trial court or trier of fact "on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

The record establishes that the presiding judge recognized that the frustration between Sheikh and counsel amounted to a difference of opinion in strategy and

choices and did not justify a change of counsel on the eve of trial. Despite this, the court gave Sheikh an opportunity to find new counsel who could come up to speed in six weeks given the anticipated interruption of witness availability in the trial schedule. In other words, the court balanced Sheikh's right to choose his counsel against the public's interest in the prompt and efficient administration of justice. When Sheikh was unable to find a lawyer who could timely prepare for trial, the court did not abuse its discretion in denying counsel's motions to withdraw so that the four-year-old case could proceed to trial.

Child Hearsay

Sheikh next contends that the trial court erred in admitting statements under the child hearsay statute. He argues that because A.M. had a motive to lie and had a reputation for untruthfulness A.M.'s statements were unreliable, precluding their admission. We disagree.

RCW 9A.44.120 permits a court to admit a "statement not otherwise admissible by statute or court rule" in criminal proceedings where it "is made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, describing any attempted act of sexual contact with or on the child by another." RCW 9A.44.120(1)(a)(i). Before the statement may be admitted, the court must find "that the time, content, and circumstances of the statement provide sufficient indicia of reliability." RCW 9A.44.120(1)(b).

"A finding that statements are within the statutory child abuse exception should not be reversed absent a showing of manifest abuse of discretion." State v. Woods, 154 Wn.2d 613, 623, 114 P.3d 1174 (2005) (quoting State v. Jackson, 42 Wn. App.

393, 396, 711 P.2d 1086 (1985)). We "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." Thomas, 150 Wn.2d at 874-75.

Courts apply the nine-factor test outlined in State v. Ryan, 103 Wn.2d 165, 691 P.2d 197 (1984), to analyze the reliability of child hearsay statements:

> (1) whether the child had an apparent motive to lie, (2) the child's general character, (3) whether more than one person heard the statements, (4) the spontaneity of the statements, (5) whether trustworthiness was suggested by the timing of the statement and the relationship between the child and the witness, (6) whether the statements contained express assertions of past fact, (7) whether the child's lack of knowledge could be established through cross-examination, (8) the remoteness of the possibility of the child's recollection being faulty, and (9) whether the surrounding circumstances suggested the child misrepresented the defendant's involvement.

State v. Woods, 154 Wn.2d 613, 623, 114 P.3d 1174 (2005) (citing Ryan, 103 Wn.2d at 175-76).

"No single factor is decisive; rather, reliability is based on an overall evaluation of the factors." State v. C.M.B., 130 Wn. App. 841, 848, 125 P.3d 211 (2005). The factors exist to assist the trial court in determining "whether the comments and circumstances surrounding the statement indicate reliability." State v. Kennealy, 151 Wn. App. 861, 880-81, 214 P.3d 200 (2009) (citing State v. Swan, 114 Wn.2d 613, 648, 790 P.2d 610 (1990)). Here, Sheikh focuses his argument on the first two factors.

Sheikh argues that A.M. had a motive to lie because she was aware that her father's friend and Sheikh had a disagreement over a business deal. During the child-hearsay hearing, P.M. testified that he and Sheikh had attempted to start a business together selling computers, but it "never took off really." P.M. attempted to connect Sheikh with P.M.'s friend, Henry, in order for the two to conduct computer business

together. Henry gave money to Sheikh to pay for an order of computers or laptops that Sheikh never delivered. P.M. did not know how much money Henry gave Sheikh, but believed it could be $10,000. P.M. thought he may have been promised a commission on the sale. P.M. never received any money. Following the failed deal, Henry made vague threats toward Sheikh when speaking to P.M. to the effect of "if Harun doesn't, you know, repay my money or doesn't do this, you know, he's going to know who I am." P.M. stated that Henry never made any specific threats toward Sheikh. P.M. stated that he had never spoken to A.M. or his other children about the problems between Sheikh and Henry, but acknowledged that A.M. could have heard something about it when Henry talked about it while visiting. P.M. also explained that he did not believe Henry had ever spoken to A.M. about their business dealings either. P.M. testified that he never had an argument or fight with Sheikh regarding the business dealings, but simply "started distrusting him." Makumbi also testified that she had never observed A.M.'s father and Sheikh fighting or arguing and never observed A.M.'s mother or father talk about Sheikh with A.M. before she accused him of raping her.

The trial court explained that the State had presented "uncontroverted evidence" that A.M.'s father remained friends with Sheikh even after their business dispute and that A.M.'s father had "no hard feelings towards Mr. Sheikh and in fact continued to go to his house after that and still remained friends with Mr. Sheikh." The court also noted that A.M.'s father never talked to A.M. about any issues regarding the business between himself and Sheikh.

Sheikh also argued at the hearing that A.M. had another motive to lie – to avoid getting in trouble for watching pornography. Sheikh posited below that A.M. "admits

that she watched porn" and thought she may be in trouble for it, so blamed Sheikh in an effort to avoid trouble. C.M. testified that A.M. was not permitted to watch pornographic videos. C.M. explained that while the family was living with another relative at some point when A.M. was younger, that a relative had used C.M.'s computer to view pornography and the children were able to access it in a window or screen left open afterward. After seeing the images on the computer, A.M. reported to her mother "Mommy, there are bad things on the computer." C.M. discussed with A.M. that the images were "very wrong." There was no evidence presented that A.M.'s parents were aware or suspicious that A.M. had viewed pornography in Sheikh's house before she reported the abuse.

The court observed that no adults in A.M.'s home "had any knowledge prior to [A.M.]'s disclosure that there was any abuse potentially happening in the Sheikh house" to A.M. or her sibling. Notably, in the prior instance in which A.M. had incidentally observed pornography, she immediately reported her observation to her mother. On appeal, Sheikh argues "the internet history from Mr. Sheikh's computer indicated that someone was still conducting web searches for pornography in the minutes after the video was accessed and that more than one web search for pornography was conducted and more than one pornography site was accessed." However, no such evidence was presented to the trial court at the time it ruled the child hearsay statements admissible.

Based on the information provided, the court found that A.M. did not have an apparent motive to lie, and that factor weighed in favor of finding her statements reliable. In its ruling, the court noted the other evidence corroborating A.M.'s

statements. The trial court explained that the substance of A.M.'s accusations never changed. A.M. consistently stated to multiple people that Sheikh had attempted to anally penetrate her, showed her pornography, and forced her to perform the oral sex depicted in the pornography on Sheikh. The trial court further found that prior to this incident, A.M. had never said anything bad about Sheikh previously and had only good things to say about Sheikh's wife.

Sheikh also argued that there was evidence that A.M. had a reputation for lying in order to not get in trouble and to avoid responsibility. Each of the three adults living in A.M.'s home in 2014 stated that A.M. would occasionally tell "normal kid lie[s]" such as saying her homework was done when it was not, or telling her parents she had taken a shower when she had not. Makumbi agreed that A.M. had never lied about "big things" prior to the 2014 sexual assault. P.M. did not remember A.M. lying about anything big before 2014. C.M. testified that she "constantly" discussed the difference between telling the truth and lying with her children and that A.M. understood the difference.

The trial court explained that the character of A.M. "weighs in favor of the reliability of her child hearsay statements." The court explained that prior to the alleged 2014 sexual assault, A.M. had gotten in a normal amount of trouble for a child regarding her chores. The court found A.M. understood the difference between right and wrong. The court observed that the evidence showed "[b]asically all the people in her life, the three witnesses, verified that [A.M.] did not have a substantial issue with lying and had no history of making lies about big things or serious stuff." The court explained that

A.M. only began to get in trouble and tell more serious lies[3] after the reported incidents and that prior to that point, "she had not previously experienced any of those issues." The court also noted that in her video interview with a forensic investigator, A.M. stated she knew the difference between truth and lies and promised to only tell the truth in the interview.

After hearing testimony from three witnesses and viewing video of A.M.'s 2014 interview with a forensic investigator in its entirety, the trial court went through each of the <u>Ryan</u> factors on the record and found that each weighed in favor of the reliability of A.M.'s hearsay statements regarding Sheikh's abuse. We conclude that the trial court did not abuse its discretion in ruling that the statements were admissible.

<u>Right to Present a Defense</u>

Sheikh next challenges the trial court's decision to exclude 11 text messages uncovered in the forensic examination of Sheikh's cell phone. Sheikh argues that the exclusion of the evidence violated Sheikh's right to present a defense by precluding him from presenting evidence to bolster his theory that P.M. framed Sheikh and coached A.M. to accuse Sheikh of abusing her.

Both the United States and Washington state constitutions guarantee a defendant's right to compulsory process and to confront the witnesses against him.[4] U.S. Const. amend. VI; Const. art 1, § 22. The right to present testimony and evidence

---

[3] A.M.'s parents reported that, following the assault in 2014, A.M. began to get in trouble at school. A.M. stole the cell phone of another student at her school in Pennsylvania and lied about having it in her possession. P.M. stated that during that period in Pennsylvania, A.M. was regularly in trouble at school, stole things, sought attention, and refused to attend school.

[4] "Courts and litigants often refer to these rights, collectively, as the 'right to present a defense,' although this phrase does not appear in our state or federal constitutions." <u>State v. Bedada</u>, No. 79036-6-I, slip op. at 6 n.2 (Wash. Ct. App. May 11, 2020), https://www.courts.wa.gov/opinions/pdf/790366.pdf.

in one's own defense "is not absolute" and "does not extend to irrelevant or inadmissible evidence." State v. Strizheus, 163 Wn. App. 820, 830, 262 P.3d 100 (2011). Evidentiary rulings alleged to have violated a defendant's constitutional right to present a defense are reviewed in a two-step process. State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). First, we review the challenged evidentiary rulings under an abuse of discretion standard. Then, if that discretion was not abused, we review de novo whether such rulings violate a defendant's constitutional right to present a defense. Id. at 797-812. This court only reaches the second step "if the ruling was either within the trial court's discretion or an abuse of discretion but harmless." State v. Broussard, 25 Wn. App. 2d 781, 786, 525 P.3d 615 (2023).

"We review a trial court's decision to exclude evidence for abuse of discretion." State v. Franklin, 180 Wn.2d 371, 377 n.2, 325 P.3d 159 (2014). A trial court abuses its discretion if "no reasonable person would take the view adopted by the trial court." State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 59 (2006) (citing State v. Ellis, 136 Wn.2d 498, 504, 963 P.2d 843 (1998)). Courts must "exercise reasonable control" over the presentation of evidence so as to make it "effective for the ascertainment of the truth" and to "avoid needless consumption of time." ER 611(a).

The right to present a defense is not absolute and evidence the accused seeks to admit must be at least minimally relevant. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "Generally, any circumstance is admissible which reasonably tends to establish the theory of the

party offering it, to explain, qualify or disprove the testimony of his adversary." State v. Young, 48 Wn. App. 406, 410, 739 P.2d 1170 (1987). The "threshold to admit relevant evidence is very low. Even minimally relevant evidence is admissible." State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). For evidence to be relevant, there must be a logical nexus between the evidence and the fact to be established. State v. Cochran, 102 Wn. App. 480, 8 P.3d 313 (2000).

Here, Sheikh sought to introduce 11 text messages he claimed were from Henry, P.M.'s friend, containing threats after their failed business deal in which Henry believed Sheikh owed him money. The defense argued that the messages showed that Sheikh was receiving threats from someone regarding his prior business dealings with P.M. and Henry, indicating that A.M.'s allegations may have been fabricated. While the exhibit showed the phone number from which the messages were sent, there was no testimony about who that number belonged to. The messages state that the sender had not received $500 it expected from Sheikh and instructed him to leave the money with P.M. The messages, dating from August 23 to September 5, 2014 portray an increasing frustration with not receiving the money, stating "no playing or joking with you anymore tonight we will get our money from you and I promise you that to avoid a fight and trouble you have never seen before" and "this will not be a joke anymore." At the time the defense sought to introduce the messages it had already completed cross examination of P.M. Defense counsel did not cross-examine P.M. on the text messages or his business relationship with Henry or Sheikh.

In excluding the text messages from evidence, the court explained,

[P.M.] testified. He was on the stand. You had the opportunity to cross him about motive to lie, all the issues relating to his credibility and how he may or

24

may not have influence [A.M] to report – if that's the defense's case theory – because of whatever failed business relationship he might have had.

These messages, there is no one to identify who the sender is. The Court can't find any relevance as it relates to [A.M.'s] family. And for that reason the Court is currently of the position that they shall not be admitted.

Sheikh did not present evidence creating a logical nexus between the text messages and P.M. We conclude that the trial court did not abuse its discretion in excluding the evidence as irrelevant. We must next examine de novo whether the ruling violated Sheikh's right to present a defense.

Sheikh argues that the exclusion of the text messages prevented him from presenting his theory that Sheikh "was framed by A.M.'s family and that A.M. was coached by her father to make the accusations against Mr. Sheikh." Sheikh posits that the messages excluded showed "messages from A.M.'s father's business associates threatening Mr. Sheikh with serious consequences if he failed to pay money that he owed to them back to A.M.'s father, [P.M.]"

Despite the exclusion of the messages, Sheikh presented a defense. P.M. testified at trial about his business ventures with Sheikh, including the failed deal with P.M.'s friend. P.M. testified that his friend had given money to Sheikh and that Sheikh had not delivered the promised goods in exchange. Defense counsel elected to not cross-examine P.M. about the business deal or any threats made against Sheikh as a result. Instead, Sheikh's defense theory centered around the fact A.M. had previously seen pornography and knew that she was not supposed to view it. In closing, Sheikh focused around attacking inconsistencies in A.M.'s testimony and highlighting the forensic evidence. Forensic evidence indicated that multiple searches took place on Sheikh's computer around the time A.M. said she was forced to watch pornography and

then forced to perform oral sex on Sheikh. Sheikh argued that A.M. testified that she only watched for about a minute and did not watch the entire video before being forced to perform oral sex. Yet, Sheikh argued "somebody is searching while supposedly forcing [A.M.] to provide oral sex." He also emphasized the lack of Sheikh's DNA evidence despite forensic examination of areas where A.M. described Sheikh had ejaculated.

Because a defendant's constitutional right to present a defense is not absolute, evidence must be balanced against the defendant's need for the information sought to be admitted. Arndt, 194 Wn.2d at 812. See, e.g., Jones, 168 Wn.2d at 720. In Jones, the trial court interpreted a rape shield law to preclude the defendant from presenting any evidence that the victim had voluntarily engaged in an "all-night drug-induced sex party." Jones, 168 Wn.2d at 721. The Washington State Supreme Court reversed, noting that this testimony was "evidence of extremely high probative value; it is Jones's entire defense." Id. While the Jones court "held that the rape shield statute was inapplicable as a matter of law, [it] also observed that even if the statute did apply, the fact that the 'sex party evidence' was Jones's entire defense meant that the statute could not be invoked to bar the admission of such evidence without violating the Sixth Amendment." Arndt, 194 Wn.2d at 813 (citing Jones, 168 Wn.2d at 723-24). Unlike the defendant in Jones, the exclusion of the text messages did not leave Sheikh without any defense. The failed business deal with P.M.'s friend was still admitted, though not explored further. Instead, Sheikh decided to focus on how the forensic evidence supported reasonable doubt that any rape or attempted rape took place.

We conclude that the trial court properly excluded the text messages and that

26

doing so did not violate Sheikh's right to present a defense.

Prosecutorial Misconduct

Sheikh finally challenges statements made in the State's closing argument. Sheikh argues that two arguments made by the prosecutor amount to prosecutorial misconduct. He first contends that the prosecutor committed misconduct by stating that if the jury believed A.M.'s testimony, it had to find Sheikh guilty. He next asserts that the prosecutor misstated the burden of proof by stating that the jury did not need to look for a doubt.

Prosecutors have "wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence." State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (quoting State v. Gregory, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), overruled on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014)). A prosecutor "commits misconduct by misstating the law." State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 286 (2015). To prevail on a claim of prosecutorial misconduct, a defendant must show that "in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).

Once a defendant establishes that a prosecutor's statements are improper, we determine whether the defendant was prejudiced. If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). Where a defendant fails to object at trial, we apply a

heightened prejudice standard, requiring the defendant to show that the prosecutor's misconduct was "so flagrant and illintentioned that [a jury] instruction would not have cured the [resulting] prejudice." State v. Loughbom, 196 Wn.2d 64, 70, 470 P.3d 499 (2020) (quoting State v. Walker, 182 Wn.2d 463, 477-78, 341 P.3d 976 (2015)). If the defendant is unable to meet this heightened prejudice standard, he is deemed to have waived any error. Emery, 174 Wn.2d at 760-61 (citing State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)). Essentially, a defendant who did not object at trial must show the improper conduct resulted in "incurable" prejudice. State v. Zamora, 199 Wn.2d 698, 709, 512 P.3d 512 (2022).

We review the prosecutor's conduct and whether prejudice resulted from it "by examining that conduct in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

Sheikh first challenges the prosecutor's statement that the question of guilt comes down to whether the jury believed the testimony of A.M. Sheikh argues that this statement is "contrary to the prohibition against telling the jury to decide the case based on who they believed."

However, the context of the statement and the circumstances show that the argument was not improper. The statement was made in the context of the prosecutor's larger explanation that testimony itself was considered evidence the jury could use in reaching a verdict. In the relevant portion of the argument the prosecutor stated

28

> Finally, during instruction 1, very long, lots of paragraphs, contains a couple of points that are very important. The first is what is the evidence you are to consider. The evidence is testimony. Testimony comes from the people that sit down there and shared with you what it is they saw, they heard, they felt, they experienced. That is evidence. It's the heart of every case, civil or criminal. (Inaudible) every juror that sat before you has heard evidence and testimony.
>
> And in this state in this type of case that's incredibly important is the word of a victim enough – or alone is enough. The word of a victim alone is enough. There is no requirement that requires you – or asks you to search your instructions for that requirement that say to provide you corroborating evidence, to provide you DNA, fingerprints. That's not in the law. That's not a requirement. The only requirement for you to find Mr. Sheikh guilty is to believe [A.M] when she tells you what happened to her.

The prosecutor went onto explain that jurors "are the sole judges of credibility. That means you get to determine who is telling the truth." The prosecutor further argued why, based on the evidence, the jury should find A.M.'s testimony credible and why it should find Sheikh's statements in an interview played for the jury not credible.

In a similar case, the Washington Supreme Court held that where a prosecutor stated "if you believe [the victim], you must find him guilty unless there is a reason to doubt her based on the evidence in the case," the argument was not misconduct because "the prosecutor did not tell the jury there was a presumption that D.T. was telling the truth, but rather argued that the jurors should believe her testimony and if they did, then they should find [the defendant] guilty." State v. Thorgerson, 172 Wn.2d 438, 454, 258 P.3d 43 (2011).

We conclude that, in the context of the argument and evidence presented, it was not improper for the prosecutor to argue that the testimony of the victim was evidence that met the State's burden to prove the crime beyond a reasonable doubt.

Sheikh next challenges the prosecution's statement in rebuttal that the jury "need not find a doubt. You need not look for one. If you believe what happened you are

29

convinced beyond a reasonable doubt." He contends that this statement amounts to an impermissible "fill in the blank" argument prohibited under State v. Johnson, 158 Wn. App. 677, 243 P.3d 936 (2010). In Johnson, the prosecutor told the jury "to be able to find reason to doubt, you have to fill in the blank, that's your job." Johnson, 158 Wn. App. at 682. This court has also found improper similar arguments telling the jury it is required to "fill in the blank" or to articulate a reason for their doubt before finding a defendant not guilty. State v. Anderson, 153 Wn. App. 417, 431, 220 P.3d 1273 (2009) (improper to argue that "in order to find the defendant not guilty, you have to say 'I don't believe the defendant is guilty because,' and then you have to fill in the blank."); State v. Venegas, 155 Wn. App. 507, 523, 228 P.3d 813 (2010) (improper to argue that "[i]In order to find the defendant not guilty, you have to say to yourselves: 'I doubt the defendant is guilty, and my reason is'—blank.").

In the context of the entire argument, the prosecutor was again reiterating the argument that A.M.'s testimony, if the jury found it to be credible, provided all of the evidence necessary to prove each element of the crimes charged beyond a reasonable doubt. Viewed in context, the prosecutor was also responding to the defense argument that "a reasonable doubt is just that. It's a doubt . . . it can be any reasonable doubt that you find." The prosecutor argued:

> Beyond a reasonable doubt. What is beyond a reasonable doubt? I can tell you what it is not. It is not a doubt. It is not any doubt. Beyond a reasonable doubt means a doubt that after fully, fairly, and carefully examining all of the evidence would exist in the mind of a reasonable person.
> And there's a second part to the definition of beyond a reasonable doubt. It means that if you make that consideration of the evidence, if you look at all of the evidence, not in a vacuum, not in isolation, but in its entirety and you believe that evidence, you are convinced beyond a reasonable doubt. You need not find a doubt. You need not look for one. If you believe what happened you are convinced beyond a reasonable doubt.

The prosecutor did not tell the jury that it would be required to articulate a reason for any doubt, as is prohibited by Johnson, Venegas, and Anderson, but rather correctly articulated the reasonable doubt standard as explained in the court's instructions to the jury. We hold that the prosecutor did not commit misconduct.

We affirm.

_Cohen, J._

WE CONCUR:

_Feldman, J._          _Smith, C.J._